**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| **GEORGE DIX,** | : | **Case No. 1:18-cv-00275** |
| Plaintiff, | : | **Judge Douglas Cole** |
| vs. | : | |
| **ATOS IT SOLUTIONS AND SERVICES, INC.,** | : | **PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| Defendant. | : | |

## I. INTRODUCTON

Plaintiff was a valuable and high-performing executive at Anthelio Healthcare Solutions. When Atos purchased Anthelio in September of 2016, it gave Plaintiff a Retention Agreement and promised him a $100,000 bonus if he remained with the company until June 30, 2017. Atos reserved the right to terminate Plaintiff for cause in the event of a policy violation, but only after providing notice and an opportunity to cure.

Atos fired Plaintiff in January of 2017 Atos fired Plaintiff for violating the company's policy regarding the use of company devices to access inappropriate internet sites. Atos refused to give Plaintiff the contractually required opportunity to cure. By doing so, Atos breached the Retention Agreement, and Plaintiff is entitled to the retention bonus. Atos claims Plaintiff's violation was incurable, but that dispute, if relevant, would be for a jury to decide.

As argued more fully below, Defendant's motion for summary judgment should be denied.

## II.    FACTS

Plaintiff was hired by Anthelio in May of 2013. (Dix. Declaration, Attached as Appendix A, ¶ 2). Plaintiff was the Client Executive for the McLaren Healthcare account based in Flint, Michigan. (Id.) Plaintiff reported to Asif Ahmad. (Id.) Plaintiff lived and worked in Michigan. (Id.).

Anthelio provided Plaintiff with a laptop computer. (Id. ¶ 3). An Anthelio employee transferred to the Anthelio laptop many personal files that Plaintiff had accumulated over his career and before his employment with Anthelio began. (Id.). As a matter of convenience, Plaintiff used the computer for personal and business reasons. (Id.). He worked long and irregular hours. (Id.). No one at Anthelio ever said anything to him about the files and information that had been transferred to the Anthelio laptop. (Id.).

In September of 2016, Atos purchased Anthelio. (Id. ¶ 6). On September 21, 2016, Paul Peterson, the Director of Human Resources for Atos, sent Plaintiff an email. Peterson stated:

> "Atos recognizes your contribution to Anthelio and looks forward to your future and continued excellent work in Atos. Today, Atos offers you a retention bonus for a short period of time as a token of your importance to our new partnership. Though this is unusual for Atos, after conversations with Asif and review of your background and past successes, we felt this is an appropriate gesture for our first steps forward together."

(Id. ¶ 7, Ex. 1).

With the email, Peterson sent a Retention Agreement. (Id. and Doc. 24-2, at Page ID # 94). Under the Agreement, Atos promised to pay Plaintiff a $100,000 bonus if he stayed at Atos until June 30, 2017. The bonus would be forfeited if Plaintiff quit or if he was terminated for cause. (Id.). In the Agreement, Atos defined "cause" as providing one or more of the following reasons for termination:

> (i) neglect or refusal of Employee to perform duties and projects assigned to the Employee to the extent such duties and projects are commensurate with Employee's experience and position with the Company; (ii) failure to adhere to the policies and procedures of the company and failure of employee to correct such failure within five (5) days of notice of such failure from the Company; or (iii) conviction of a crime involving moral turpitude, theft, fraud, embezzlement or violence."

(Id. at Page ID # 94-95). If Atos terminated Plaintiff without cause prior to June 30, 2017, he was entitled to the bonus. (Id. at Page ID # 94). Plaintiff signed and returned the Agreement. His excellent performance continued. (Dix. Decl. ¶ 9). No one from Atos or McLaren expressed any complaints about his work. (Id.).

After Atos purchased Anthelio, Atos issued another laptop to Plaintiff. (Id. ¶ 8). Plaintiff continued to use his Anthelio laptop while the Atos IT department transferred the existing files and data from the Anthelio laptop to the Atos device. (Id.) The process was taking longer than expected. (Id.). Plaintiff was eager for the files to be transferred and was pushing Rebecca Kirby, the IT technician, to complete the process. (Id.).

According to Defendant, and unbeknownst to Plaintiff, in November of 2016, Ms. Kirby allegedly discovered pornography on Plaintiff's computer. She told her boss, Phil Dean about it. (Doc. 24, Brown Decl. ¶ 7, Page ID # 85). No one said anything to Plaintiff. (Dix. Decl. ¶ 10). Kirby and Dean were friendly with Charlie Cain, a subordinate of Plaintiff who was being counselled about his performance. (Id. ¶ 12).

Plaintiff became an employee of Atos on January 1, 2017. (Atos Answer, Doc. 10, ¶ 7, Page ID # 34).

On January 9, 2017, Phil Dean told Plaintiff's supervisor Gary Trickett, that Kirby found pornography on Plaintiff's computer. (Doc. 24, Brown Decl. ¶ 7, Page ID # 85; Dix. Decl. ¶ 25

3

and Ex. 3).[1] On January 10 and 11, 2017, Plaintiff attended meetings at the Atos office in Mason, Ohio. (Dix Decl. ¶ 11).

On January 11, 2017, Plaintiff was asked to meet with Amy Brown, the local Human Resources official. (Id. ¶ 12). Trickett was present by phone. (Id.). Plaintiff thought the call was to address Charlie Cain's performance issues. (Id.). Trickett and Plaintiff had discussed Cain's problems over the previous months and Cain was about to be removed from the McLaren account. (Id.). Trickett had sent Plaintiff a text message about Cain earlier that day. (Id.).

Trickett told Plaintiff he was being terminated because pornography was found on his computer. (Id. ¶ 13). Plaintiff was not aware of that, and he asked Trickett to provide more detail so he could respond. (Id.). Trickett refused, and stated that he and Ms. Brown were not going to discuss the matter. (Id.). Trickett told Plaintiff that if he did not resign, he would be terminated for cause. Trickett's tone threatening. (Id.). Plaintiff again asked what had been found, but Trickett refused to provide any further information. Plaintiff felt he had no choice but to submit the resignation. Plaintiff left his computer at the Mason office. (Id.).

## ARGUMENT

**A.    The Summary Judgment Standard**

Summary judgment is to be granted only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 447 U.S. 317 (1986). The court evaluating a summary judgment motion must construe the evidence in the record and all inferences to be drawn from it in the light most favorable to the party opposing the motion. *Reeves v. Sanderson Plumbing Products Inc.,* 530 U.S 133, 150-151 (2000); *Hamilton v.*

---

[1] The Investigative Timeline was produced by Atos in discovery. (See Doc. 25-1, Response to Plaintiff's Request for Document No. 13 at Atos00043-00044, Page ID # 114).

*General Electric Co.*, 556 F.3d 428, 437-38 (6th Cir. 2009). "[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury not required to believe." *Id. at* 151 (2000). Disputed facts are to be resolved in favor of the non-moving party. *Kraus v. Sobel Corrugated Containers, Inc.*, 915 F.2d 227, 231 (6th Cir. 1990). See also *Moran v. Al Basit, LLC, et al.,* 788 F.3d 201, 206 (6th Cir. 2015).

The threshold inquiry is "[w]hether there are any genuine factual issues that can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby*, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). The court should not resolve factual disputes by weighing conflicting evidence. It is the jury's role to assess the probative value of the evidence. *Id.* at 249. Credibility questions should not be decided on summary judgment. *Id.* See also *Reeves*, supra, 530 U.S. at 150-51.

**B.** **Applicable Contract Principles**

The court's role in examining any written instrument is to ascertain and give effect to the intent of the parties. *Foster Wheeler Enviresponse v. Franklin Cty. Convention Facilities Auth.*, 78 Ohio St.3d 353 (1997), citing *Aultman Hosp. Assn. v. Community Mut. Ins. Co.,* 46 Ohio St.3d 51, 53 (1989). The intent of the parties is presumed to reside within the four corners of the contract. *Kelly v. Med. Life Ins. Co*. 31 Ohio St.3d 130 (1987). Thus, "[w]hen the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties." *Westfield Ins. Co. v. Galatis,* 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, ¶ 11. See also *United States v. Donovan*, 348 F.3d 509, 512 (6th Cir. 2003). The entire contract should be considered to ascertain the intent of the parties and to give legal effect to the whole agreement. *Perry v. Sied*, 461 Mich. 680, 611 N.W.2d 516, 520 (2000). In construing a contract, the court prefers a meaning that renders the contract able to be performed, rather than one that makes it

impossible or illegal to perform. *Kebe v. Nutro Machine Corp.,* 30 Ohio App. 3d 175, 178. (8th Dist. 1985).

Courts have no power to modify the terms of a contract. *Brock v. Scheuner Corp.*, 841 F.2d 151, 154 (6th Cir. 1988); *Long Beach Association, Inc. v. Jones*, 82 Ohio St. 3d 574, 577 (1998). "Where the terms in a contract are not ambiguous, courts are constrained to apply the plain language of the contract." *City of St. Marys v. Auglaize Cty. Bd. of Commrs.*, 115 Ohio St.3d 387, 875 N.E.2d 561, 566 (2007). As noted in *Long Beach Association*, a "court cannot in effect create a new contract by finding an intent not expressed in the clear language employed by the parties." *Id*. citing *Alexander v. Buckeye Pipe Line Co.,* 53 Ohio St.2d 242, 246 (1978). In *Brock*, supra, the court addressed a contractual dispute involving a settlement agreement and held: "The court must enforce the settlement as agreed to by the parties and is not permitted to alter the terms of the agreement." 841 F.2d at 154, citing *In re Air Crash Disaster at John F. Kennedy Int'l. Airport*, 687 F.2d 626, 629 (2nd Cir. 1982). See also *Aultman Hospital Ass'n.,* supra, 46 Ohio St. 3d at 54 (refusing to accept a construction of the contract urged by one party because it "would not be a construction at all but would amount to the making of a new contract for the parties which is not the function of the court.").

C.     **Atos Breached the Retention Agreement.**

Atos defined "cause" as one or more of the following reasons for termination:

(i) neglect or refusal of Employee to perform duties and projects assigned to the Employee to the extent such duties and projects are commensurate with Employee's experience and position with the Company; (ii) failure to adhere to the policies and procedures of the company and failure of employee to correct such failure within five (5) days of notice of such failure from the Company; or (iii) conviction of a crime involving moral turpitude, theft, fraud, embezzlement or violence."

6

(Brown Decl., Doc. 24-1 at Page ID # 94-95). For breaches in the first and third categories, Plaintiff had no right to cure. However, Atos decided that the second category involving policy violations expressly required notice and a five-day cure period.

### 1. Atos violated the notice and cure provisions of the Agreement.

The Retention Agreement is clear and unambiguous. Compliance with the notice and cure provision was a condition precedent to termination. Courts have enforced similar provisions against breaching parties like Atos.

In *Chrysler Realty Co. v. Design Forum Architects*, 341 F. App'x 93 (6th Cir. 2009), the panel affirmed an award of summary judgment against Chrysler Realty. Like the Agreement in this case, the contract contained a notice and cure provision:

> "Article 1.3.8.1 A. of the agreement further requires that if a party breaches the contract or is accused of doing so, as Design Forum was here, the non-breaching party (CRC) must provide notice to the breaching party and an opportunity to cure the defect, before it may terminate the contract. Article 1.3.8.1 A. provides, in pertinent part:
>
> The non-breaching party may then terminate this Agreement by written notice if the breaching party does not cure such breach within 30 days after receipt of notice of breach, or, if the breach is not capable of being remedied in 30 days, the breaching party fails to commence the cure within 30 days, and diligently pursue the curative action to completion within a reasonable time."

*Id.* at 96. Because Chrysler Realty failed to comply with the notice and cure provision, the district court entered judgment in favor of Design Forum. The Sixth Circuit affirmed and stated:

> "We agree with the district court that CRC's breach of the notice and the opportunity to cure provisions was a "substantial" breach because, as a result of its breach, Design Forum was deprived of the opportunity to cure the alleged defects, thus "further performance by the other party [wa]s thereby rendered ineffective or impossible." *Chrysler Int'l Corp.*, 134 F.3d at 742."

*Id.* See also See also *Clubspecialists Intl. LLC v. Keeneland Ass'n, Inc.*, No. 5:16-cv-345, 2018 WL 2050134 (ED Ky. Feb. 8, 2017)("Before it can terminate the agreement, however, the contract

requires Keeneland to notify CSI of contractual deficiencies and to provide CSI the opportunity to cure any alleged breach. (Compl. Ex. A). Failure to do so would constitute a breach of contract by Keeneland.") citing *Chrysler Realty Co*., supra, 341 F. App'x at 96.

In *Convergent Group Corp. v. County of Kent,* 266 F. Supp. 2d 647 (W.D. Mich. 2003), the court reached a similar conclusion. The contracts at issue contained notice and cure provisions. *Id*. at 651. According to the court, the County could terminate the agreement or pursue other remedies "only after the specified conditions were met." *Id*. at 657. The court stated that under Michigan law, parties may condition the right to terminate for a material breach upon notice and the opportunity to cure. *Id*. at 657-58, citing *Lichnovsky v. Ziebart Int'l Corp.,* 414 Mich. 228, 236-37, 324 N.W.2d 732, 737 (1982). The court also discussed with approval the case of *Needham v. Candie's, Inc.,* No. 01 Civ.7184 LTS FM, 2002 WL 1896892 (S.D.N.Y. Aug.16, 2002), *aff'd,* 65 F. App'x 339 (2nd Cir. 2003), another decision where the failure to comply with a notice and cure provision resulted in judgment for the non-breaching party. *Id*. at 658. In *Needham* the court stated: "Parties must adhere to contractually-secured cure provisions regarding contract termination when the cause for the termination is `the very situation to which the cure provision was intended to apply.'" *Id.* at *3 (quoting *Rebh v. Lake George Ventures, Inc.,* 223 A.D.2d 986, 987, 636 N.Y.S.2d 504, 505 (3d Dep't 1996)). After reviewing the above authority, the court granted summary judgment against the County because it failed to comply with the notice and cure requirements in the agreements. 266 F. Supp.2d at 658.

In *Ashker v. Aurora Medical Group, Inc.,* 352 Wis. 2d 193, 841 N.W.2d 297 (2013), the court applied the above principles and awarded summary judgment against an employer like Atos that failed to strictly comply with a notice and cure provision. Ashker was a radiologist. His contract permitted termination for a material breach upon written notice and a 30-day cure period.

*Id*. at 197. The contract also allowed Aurora to terminate Ashker without cause in exchange for 90 days' severance pay. *Id.* Aurora fired Ashker without notice after he was accused of destroying medical records to cover up a malpractice claim. *Id*. at 197-198. Like Atos, Aurora claimed that the conduct amounted to an "incurable material breach." *Id*. The trial court rejected that argument and granted summary judgment to Ashker. *Id*. at 198-199. The court held that because Aurora did not comply with the notice and cure provision required in the event of a "for cause" termination, the dismissal was "without cause" and Ashker was entitled to the severance pay. *Id*. at 199-200. The appellate court affirmed and stated that "If Aurora had wanted to be able to immediately terminate Ashker under the circumstances presented in this case, it could have negotiated such a term in the employment agreement." *Id*.

As in the above cases, the Retention Agreement expressly and unambiguously required Atos to provide notice and an opportunity to cure a policy violation prior to termination. Atos failed on both counts.

First, Atos never provided sufficient notice of the breach. Atos knew in November of 2016 that Plaintiff may have had inappropriate materials on his computer. (Brown Decl., Doc. 24, ¶ 7, Page ID # 85). No one said anything to him. (Dix Decl., ¶ 10). Instead, it appears that Ms. Kirby continued the process of transferring all of Plaintiff's files to the Atos device. (Dix Decl. ¶ 8). Further, when Atos terminated Plaintiff on January 11, 2017, it refused to describe the specific information that was found on his computer. (Id. ¶ 13). Nothing was said about an alleged picture or video of Plaintiff, visits to internet sites, web cams or Skype chats. (Id. and ¶ 16). Atos had a contractually binding obligation to explain the basis for its action so Plaintiff could meaningfully respond and cure the violation. It refused to do so. Even when Plaintiff later attempted to explain

9

that he did not do intentionally download offensive materials to the computer, Atos refused to engage him on the issue. (Dix. Decl. ¶ 19, Ex. 2 at Atos000206-207 and Atos000212).

In *Lane v. City of Pickerington*, 588 F. App'x 456 (6th Cir. 2014), Lane, was accused of having pornographic pictures on his work computer. When he asked to see them, the City refused. The Sixth Circuit held that the failure to do so violated Lane's right to notice and an opportunity to respond. ("Lane was denied the opportunity to see the photographs he was accused of viewing and retaining, depriving him of a meaningful opportunity to tell his side of the story."). While Lane was entitled to due process under the United States Constitution, the court's conclusion regarding the lack of proper notice is applicable here. Plaintiff had a contractual right to notice, and as in *Lane*, Atos refused to provide any information that would have allowed Plaintiff to address the allegation.

Second, and even setting aside the lack of proper notice, it is undisputed that Atos failed to provide Plaintiff with the contractually-required right to cure. Atos considered the use of company devices to access inappropriate material or sites to be a policy violation. (Brown Decl., Doc 24, ¶ 11 Page ID # 86 and Ex. F, Page ID # 107).[2] Accordingly, the stated "cause" for termination – a policy violation – was the very situation to which the cure provision was intended to apply. See *Needham*, supra, 2002 WL 1896892 at *3. As a result, Plaintiff was entitled to a five-day correction

---

[2] While the Retention Agreement explicitly guaranteed Plaintiff the right to cure, it should be noted that none of the policies cited by Atos set forth "zero-tolerance" offenses that automatically result in termination. The "Employee Conduct and Work Rules" do not mandate immediate dismissal for the use of computer equipment "to access inappropriate materials or Internet sites." (Brown Decl., Doc 24, Ex. F, Page ID # 107). Instead, the policy says only that such a violation "may lead to disciplinary action, up to and including termination." (Id.) The policy further provides that "Whenever possible, we attempt to counsel employees regarding these [work related] problems." (Id.). In addition to those representations regarding corrective counseling, through the Retention Agreement, Atos imposed an express limit on the right to terminate Plaintiff and promised him an extra layer of job protection – the opportunity to cure a policy violation.

period. Instead of complying with the contract, Atos terminated Plaintiff immediately and prevented him from taking any action to cure his conduct. See *Chrysler Realty*, supra, 341 F. App'x at 96. Because Atos failed to follow the steps required under the Agreement to terminate Plaintiff for a policy violation, the dismissal is without cause and Plaintiff is entitled to the retention bonus. See *Ashker*, supra

### 2. Defendant's "futility" argument should be rejected.

Atos seeks to avoid its admitted failure to comply with the notice and cure provisions by arguing that any attempt to cure would have been futile as a matter of law. (Atos memo, Doc, 26 at 11, 13 Page ID #3375, 3377). Atos's argument is without merit.

First, Atos adds language to the Retention Agreement that does not exist. The Agreement imposed a binding five-day period to correct a policy violation. There are no stated exceptions. The Agreement did not reserve an unlimited right to Atos to determine the nature or the extent of its own performance, nor did it allow Atos to determine in its sole discretion when a breach based on a policy violation would be curable. Adding a "futility" clause, or "assuming" that the parties intended one would impermissibly change the unambiguous language of the contract. A court "is not permitted to alter a lawful contract by imputing an intent contrary to that expressed by the parties" in the terms of their written contract. *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 797 N.E.2d 1256, 1261–62 (2003). In the absence of fraud or mistake, an unexpressed intention cannot be implied in a contract. *Aultman*, supra, 46 Ohio St. 3d at 54. Where the parties make promises "that are integrated into an unambiguous contract duly executed by them, courts will not give the contract a construction other than that which the plain language of the contract provides." *Id*. at 55. Atos drafted the Retention Agreement. It could have used any language it desired. Atos did not have to include a cure provision at all, and if Atos wanted to limit the right to cure for

11

certain policy violations and not others, it could have done so. It did not. See *Ashker*, supra, 352 Wisc. 2d at 199.

Second, Atos asks the Court to bypass the express condition precedent set forth in the Retention Agreement and move directly to the issue of futility. However, the cure provision is an important term of the contract that cannot simply be ignored. See *Ashker*, supra 352 Wis. 2d at 199 (enforcing notice and right to cure despite employer's claim that the breach was incurable) and *Lichnovsky v. Ziebart*, supra, 414 Mich. at 237 (noting that allowing a termination at-will would render the condition precedent of notice and cure meaningless). Atos created a self-imposed a condition on its right to terminate Plaintiff. Atos determined that policy violations were subject to cure. The cure provision presupposes that a policy violation would occur, and using company devices to access inappropriate internet cites was specifically contemplated in Defendant's policies. (See Brown Decl., Doc. 24, Ex. F, Page ID #107) and *Nash-Finch Co. v. Casey's Foods, Inc*., No. 6:15-cv-00086, 2016 WL 7106395 (E.D. Ky. Dec. 5, 2016)("Even if Plaintiffs acted wrongfully, the contract would require the non-breaching Cox Defendants to provide notice and an opportunity to cure any defects before terminating the contract.")(citing *Chrysler Realty,* supra, 341 F. App'x at 95-96.). Because Atos drafted the Agreement, strict compliance should be required. See *AU Rustproofing Center, Inc. v. Gulf Oil Corp.,* 755 F.2d 1231, 1237 (6th Cir. 1985)(strict adherence is "particularly appropriate" when the party failing to comply with the condition precedent drafted the documents.). By terminating Plaintiff immediately in violation of the express condition precedent, Atos made it impossible for Plaintiff to cure his conduct.

Third, if the Court reaches the issue of futility, it should be reviewed in the context of what Atos knew at the time it fired Plaintiff, not what it gathered through a comprehensive forensic evaluation that took place more than 18 months later.

Atos presents conflicting evidence about the information it had and relied upon on January 11, 2017 when it terminated Plaintiff. Ms. Brown says Rebecca Kirby discovered a "voluminous" amount of sexual content and that an internal review of Plaintiff's computer showed that he accessed sexual content on "thousands" of occasions. (Brown Decl., Doc. 24, ¶ ¶ 7-8, Page ID # 85). However, there is no sworn testimony from Ms. Kirby or anyone else from Atos with personal knowledge regarding what was found on the computer. Instead, Ms. Brown appears to be reporting information from the "Investigation Timeline" that Atos produced in discovery. (See Doc. 25-1, Defendant's Response to Plaintiff's First Request for Documents, Response Nos. 12 and 13, referring to "Investigation Timeline" Atos00043-00044, Page ID # 113, copy attached as Ex. 3 to App. B, Declaration of George Dix). There is nothing in the Investigation Timeline about Ms. Kirby finding a "voluminous" amount of sexual content. Unlike Defendant's memo, the Timeline says nothing about Plaintiff visiting "thousands" of internet sites or his use of a web cam. And the only reference to Skype was a message that was sent to Plaintiff, not one that he initiated. Instead, as reflected in the Timeline, when Atos fired Plaintiff on January 11, 2017, the three "Key Findings" were: "Saw pictures of George's face in sexual acts;" "Male genitals;" and "Time stamp was doing (sic) normal business hours." (App. B, Dix. Decl. Ex.3 at Page 2).

Atos now admits that there was no video of Plaintiff and there were no pictures of him. (Atos memo, Doc. 26 at Page ID # 3370 and Brown Decl., Doc. 24, ¶ 10, Page ID # 86). As a result, Atos attempts to support its argument with information collected during a subsequent external forensic evaluation of Plaintiff's computer. In discovery, Plaintiff asked for "the specific documents upon which Defendant relied to decide to request Plaintiff's resignation or terminate his employment." (Doc. 25-1, Request No. 10, Page ID # 113). Defendant's response was "Please see the materials extracted from Plaintiff's Dell Latitude E6430 by FTI Consulting (including

video file, spreadsheets detailing activity via internet history and web chat formats (i.e. Skype)), at Atos000203.1-000205." (Id.). However, Ms. Brown said the external forensic review occurred after Plaintiff's termination meeting. (Brown Decl., Doc. 24, ¶ 10, Page ID # 86). And according to Atos's expert David Freskos, FTI Consulting didn't even receive Plaintiff's computer until October 24, 2018. (Freskos Decl., Doc. 25-8, ¶ 5, Page ID # 3281). [3]

Since the forensic review that resulted in the discovery of the websites stored by Google Chrome, the Skype chat messages, and other materials did not take place until at least late October of 2018, Atos could not have relied upon that information at the time of Plaintiff's dismissal. Given the above, there is a serious question about what Atos knew as of January 11, 2017 when it terminated Plaintiff.

Atos says its mistake about Plaintiff being in a picture or video is of no moment. (Atos memo, Doc. 26 at Page ID # 3373). But arguing after the fact that the same decision would have been justified is not the same as proving that the same decision would have been made based on what it knew at the time. See *Rhode v. Massachusetts Mutual Life Ins. Co.*, 632 F.2d 667, 670 (6th Cir. 1980)(party acting in bad faith regarding condition precedent cannot later argue that it would have reached the same conclusion even it would have acted in good faith in the first instance.).

Fourth, Defendant's argument that the breach could not have been cured fails to account for the fact that Defendant never gave Plaintiff specific information on January 11, 2017 and the

---

[3] Atos's reference to "thousands" of visits appears to be based on a spreadsheet created in late October of 2018 by FTI Consulting and produced in discovery. (Doc. 25-2, listing 21,499 entries, produced in discovery as Atos000203.1). However, many entries reflect the exact same time to the second. For example, entries at lines 8-10 all refer to "Maryliz's Cam" and all occurred at 3:53:50 AM on August 10, 2016 (Doc. 25-2 at Page ID # 119). According to Atos's expert, there were over 500 unique URL web cam sites, not thousands. (Doc. 25-8, Frescos Decl. ¶ 9 at Page ID # 3282, citing Appendix D to his report.). Of those, the great majority were before January 1, 2017 when Plaintiff became an Atos employee. Defendant has not included Appendix D to the Freskos Declaration with its filings. Plaintiff has attached it to Appendix C, Declaration of Counsel.

chance to explain his conduct. Given proper notice of the information Defendant had at the time, Plaintiff could have immediately refuted the false assertion that there was a picture or video of him engaged in sexual acts. (Dix. Decl. ¶ ¶ 24, 25). He could have pointed out that he did not intentionally download objectionable material to the computer, and that if he knew there was anything improper on his computer, he would not have been pushing for Ms. Kirby to complete the transfer of his files to the second computer. (Id. ¶ 21). Plaintiff could have told Trickett and Ms. Brown that, although he used the computer to access sexual content, he did not use the company's computer network to do so. (Id. ¶ 20). He also could have explained that his conduct was taken in private, and that he had no intention of exposing any employee to the information that was found on his computer or the browsing history saved by Google Chrome. (Id. ¶ ¶ 23, 26). In addition, had Plaintiff been given proper notice and the opportunity to cure at that time, any objectionable material could have been removed, leaving nothing to be discovered later.

Fifth, providing the opportunity to cure would not have been futile. (Atos memo, Doc. 26 at 3375). As one court stated:

> "While case law on the question is sparse, *it is clear that to cure a material breach means to engage in subsequent conduct that substantially performs or performs without a material failure*. See Restatement (Second) Contracts § 237 cmt. b (1981) ("Even if the failure is material, it may still be possible to cure it by subsequent performance without material failure."); 2 E. Allan Farnsworth, Farnsworth on Contracts § 8.17 (explaining that a breach can be cured "by correcting the deficiency in performance.")

*Anacapa Technology, Inc. v. ADC Telecommunications, Inc*., 241 F. Supp. 2d 1016, 1020 (D. Minn. 2002)(emphasis ours).

According to Atos, the policy violations could not be cured because at the "moment the misconduct was engaged in, multiple Atos policies were irreversibly violated and the damage was done." (Atos memo, Doc. 26 at Page ID # 3378). But a cure does not require that the parties be

15

returned to their pre-violation positions. Instead, as set forth above, the test focuses on corrective action by subsequent conduct. See also *Volvo Trucks North America v. State*, 323 Wisc.2d 294, 313-314, 779 N.W.2d 423 (2010)(citing *Anacapa*, supra, rejecting the assertion that a cure "requires restoration to the *status quo ante* or repair of all harm done by the breach" and holding that "cured" as used in a statute "encompasses the meaning of cured in contract law: the breaching party had to stop the offending conduct and to substantially perform the contract. No other interpretation of the word "cured" is more reasonable.").

The Court should reject Atos's position that an "incurable breach" is one that Atos unilaterally defines as such. A cure was feasible in this case, and it would have been the same regardless of the number of policy violations: any non-Atos files and residue from the browsing history saved by Google Chrome, most of which occurred before January 1, 2017 when Plaintiff became an Atos employee, could have been removed from the computer, and Plaintiff could have been warned about any further non-business use of the device. This one-time and simple step would have allowed Plaintiff the opportunity to correct his behavior and conform his subsequent conduct to Atos's policies. There is no evidence that Plaintiff had been counselled for anything in the past or that he would not have responded favorably to a warning. See *Mirant Canal, LLC v. Local Union 369*, No. 09-cv-12216, 2010 WL 2900435 at *10 (D. Mass. July 22, 2010) (Upholding arbitrator's decision to reduce a termination to a one-day "commitment leave" despite finding that employees were guilty of "repeatedly viewing sexually explicit content at work." Among other things, the employees had good records; the conduct did not rise to the level of serious offenses such as theft, dishonesty, and gross insubordination; and there was "no evidence of harassment or other magnifying conduct."). [4]

---

[4] Plaintiff denies that he ever displayed any pornography to any employees. (App. B, Dix. Decl. ¶ 26).

16

Allowing Plaintiff the opportunity to cure as described above would have been consistent with the express language of the Agreement, the intent and spirit of the Agreement, and the implied duty of good faith and fair dealing implied in all contracts. See *Weckel v. Cole + Russell Architects*, 2013-Ohio-2718, ¶ 21, 994 N.E.2d 885 (2013)("Every contract, including a settlement agreement, contains an implied duty for parties to act in good faith and to deal fairly with each other.") and *Littlejohn v. Parrish*, 163 Ohio App.3d 456, 2005-Ohio-4850, ¶ 26-27. "Good faith performance or enforcement of a contract emphasizes faithfulness to agreed common purpose and consistency with the justified expectations of the other party." *Littlejohn, supra* at ¶ 26. "Bad faith" may consist of "interference with or failure to cooperate in the other party's performance." *Id.* at ¶ 26. Plaintiff expected the right to cure, but Atos failed to cooperate and instead, made it impossible for him to do so.

Finally, the authority cited by Atos is distinguishable and does not establish that in this case, the opportunity to cure was futile as a matter of law.

In *Giuffre Hyundai, Ltd. v. Hyundai Motor America*, 756 F. 3d 204 (2nd Cir. 2014), the contract between the parties allowed HMA to terminate immediately for any violation of law which, in HMA's "sole opinion," could tend to adversely affect the HMA's operation, management, or reputation. *Id*. at 206.[5] HMA terminated the agreement after a court determined that Giuffre's dealerships had violated several New York statutes and the federal Truth in Lending Act, 15 U.S.C. § 1601 *et seq. Id*. at 206-207. Giuffre filed suit and argued that HMA violated New York's Vehicle and Traffic law by failing to provide notice of and an opportunity to cure its breach of the dealer agreement. The court noted that the under the terms of the dealer agreement, immediate termination was allowed when there was an adjudicated finding of a violation of the

---

[5] Atos made no such reservation in the Retention Agreement for policy violations.

17

law. *Id*. at 206, 211. Because a state court determined that occurred, Giuffre's breach of the dealer agreement was incurable. *Id*. at 211. The court held that after providing notice, "HMA was under no obligation to further extend its dealings with a franchisee who had been adjudged to have "engaged in fraudulent and illegal business practices[,] ... deceptive acts[,] ... and false advertising." *Id*. The court also stated that because the dealer agreement "speaks in terms of adjudicated misfeasance, rather than simple conduct, the breach is not one which subsequent good behavior could correct." *Id*. at 211. Our case involves a policy violation for which the Retention Agreement required notice and an opportunity to cure as defined above.

In *Leghorn v. Wieland*, 289 So.2d 745 (1974), the employer violated the notice and cure provisions of the employment agreement when it asked Wieland to resign. Wieland allegedly misappropriated corporate funds for his own use and engaged in other misconduct. Because the employer failed to comply with the notice and cure provision of the employment agreement, the trial court entered judgment in favor of Wieland. *Id*. at 747. However, the appellate court reversed and noted that because the word "may" was used in the notice and cure provision, the parties did not intend to make the giving of notice the "legal duty" of either party. *Id.* at 747-48. That fact alone distinguishes this case from *Leghorn*. Further, Plaintiff did not engage in theft or dishonesty, and the Retention Agreement specifically called for the opportunity to cure his policy violation.

The arbitration decision cited by Atos occurred following a trial. (Doc. 25-11 at Page ID # 3360). It is possible, after a trial, that some jurors could find that providing Plaintiff an opportunity to cure the policy violation would have been futile. But others may reach the opposite conclusion, and that makes summary judgment inappropriate. Courts have recognized this and have allowed the issue of futility to be decided by a jury. See *Duncan v. Woodlawn Manufacturing Ltd*., 479 S.W.3d 886 (2015)(issue of futility presented to jury where employee was accused of ongoing

18

sexual liaisons with subordinates, repeated acts of sexual harassment, drinking to excess at company functions, and being arrested for public intoxication); *Cheung-Loon, LLC v. Ceragon, Inc.*, 392 S.W.3d 738, 745 (Texas App. 2012)(overturning trial court's erroneous conclusion that providing an opportunity to cure was futile, and holding that the issue was for a jury to decide); and *Sea Tow Services, Inc. v. Pontin*, 607 F. Supp. 2d 378, 390 (E.D. NY 2009)(rejecting plaintiff's assertion that use of unlicensed pilots was incurable and noting that "a rational trier of fact accepting defendants' version of the events could determine that the misfeasance was curable within the ten-day window, making plaintiff's purported immediate termination a violation of the contract.").

In light of the surrounding circumstances, including Plaintiff's demonstrated history of excellent performance; the context and purpose of the Retention Agreement; Defendant's failure to tell Plaintiff in November of 2016 that inappropriate content was found on his computer; the fact that most of the activity cited by Defendant occurred before January 1, 2017 when Plaintiff became an Atos employee; and the fact that the internet policy violations resulted in no adverse consequence to the company, a reasonable finder of fact could conclude that Plaintiff's conduct was curable and that Atos violated the Agreement when it refused to provide him the opportunity to do so.

## **CONCLUSION**

As set forth above, Atos breached the Retention Agreement by failing to provide Plaintiff with notice and the opportunity to correct his conduct. A cure was feasible. At a minimum the issue is for a jury to decide, Defendant's motion should be denied.

        Respectfully submitted,

        s/ David Torchia
        David Torchia (0015962)
        Tobias, Torchia & Simon
        302 Mercantile Center
        120 E. Fourth Street
        Cincinnati, Ohio 45202
        (513) 241-8137
        davet@tktlaw.com
        Attorney for Plaintiff

## **CERTIFICATE OF SERVICE**

    I certify that a copy of the foregoing document was filed on March 30, 2020 and will be served by the court's CM/ECF system upon all counsel of record.

        s/ David Torchia
        David Torchia