## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**GEORGE DIX,**

      **Plaintiff,**

                                **Case No. 1:18-cv-275**
     **v.**                            **JUDGE DOUGLAS R. COLE**

**ATOS IT SOLUTIONS AND**
**SERVICES, INC.,**
          **Defendant.**

### OPINION AND ORDER

This cause is before the Court on three pending motions, including: (i) Plaintiff George Dix's ("Dix") Motion to Sever Counts II and III (Doc. 33); (ii) Defendant Atos IT Solutions and Services, Inc.'s ("Atos") Motion for Summary Judgment (Doc. 26); and (iii) Atos's Motion for Sanctions (Doc. 27).

For the reasons below, the Court **GRANTS** Dix's Motion to Sever (Doc. 33), **DENIES** Atos's Motion for Summary Judgment (Doc. 26), and **DENIES** Atos's Motion for Sanctions (Doc. 27).

### BACKGROUND

This breach of contract dispute arose after Atos, an IT consulting company, fired one of its employees, George Dix, allegedly for using his work computer in violation of company policy. Dix does not dispute that he used his computer inappropriately, nor does he argue against Atos's decision to terminate his employment. Rather, Dix argues only that, under a retention contract, he is still entitled to a $100,000 "retention bonus" that Atos never paid.

**A.     Dix Began His Short-Lived Employment At Atos.**

Before Dix worked for Atos, he worked for another IT services company, Anthelio Healthcare Solutions ("Anthelio"). His employment contract with Anthelio provided that Dix would receive three months of his salary in severance pay if Anthelio "terminated [his] employment without cause due to position elimination." (Anthelio Emp. Cont., Doc. 24-1, #91). In 2016, Atos acquired Anthelio and offered to keep Dix on staff. Dix agreed, and signed a Retention Agreement on September 20, 2016. (Retention Agreement, Doc. 1-1). In the Retention Agreement, Atos promised to pay Dix a $100,000 "retention bonus" on June 30, 2017, which was nine months after he started with Atos. (*Id.* at #8). This retention bonus, however, was contingent on Dix's continued employment with the company. Specifically, Dix would forfeit the retention bonus if he "voluntarily resigned," or if Atos fired him "for cause." (*Id.*).

"For cause" is a defined term in the Retention Agreement. Atos provides three situations which might give rise to for-cause termination:

> (i) neglect or refusal of Employee to perform the duties and projects assigned to Employee to the extent such duties and projects are commensurate with Employee's skills, experience and position with the Company; (ii) failure to adhere to the policies and procedures of the Company and failure of Employee to correct such failure within five (5) days following notice of such failure from the Company; or (iii) conviction of a crime of moral turpitude, theft, fraud, embezzlement or violence.

(*Id.* at #8–9).

Dix's employment with Atos went smoothly for about three months. But in November 2016, an Atos IT employee performing routine maintenance on Dix's computer saw an explicit Skype message pop up on Dix's laptop screen. (Pl.'s Resp. to Def.'s Statement of Undisputed Facts, ("SOUF"), Doc. 31-1, ¶ 3, #3546). The

2

employee discovered more explicit content as she continued to work on Dix's computer. (*Id.*). At that point, the employee reported the explicit content to her superiors in the IT department who, in turn, got human resources involved. (*Id.*).

On January 11, 2017, Atos's human resources called Dix to a meeting where they accused him of viewing, downloading, and soliciting sexually explicit material on his work computer. (Compl., Doc. 1, ¶¶ 13–14, #3; Amy Brown Decl., Doc. 24, ¶ 9, #86). Dix claims that Atos refused to tell him the details of the inappropriate material, but instead simply demanded his immediate resignation.[1] (Compl., Doc. 1, ¶ 15, #3; Amy Brown Decl., Doc. 24, ¶ 10, #86). As demanded, Dix submitted a hand-written resignation that was effective immediately. (Compl., Doc. 1, ¶ 16, #3). Atos then hired a consulting company, FTI Consulting, to extract any explicit material from Dix's laptop. (SOUF, Doc. 31-1, ¶ 5, #3547–48). FTI confirmed that Dix has accessed voluminous amounts of sexually explicit material during his employment with Atos.[2] (*Id.*).

## B. Dix Sued Atos For Breach of Contract And Conversion.

On April 20, 2018, Dix sued Atos alleging two breach of contract claims and one conversion claim. The first breach of contract claim (Claim I) argues that Atos breached the Retention Agreement when it fired Dix without allowing him to first

---

[1] Dix alleges that Atos did not tell him the full story until this litigation forced them to do so. (Compl., Doc. 1, ¶¶ 15, 19, #3–4).

[2] Atos claims that FTI extracted "thousands of URLs confirming that Dix accessed live sex cams on his company laptop computer, as well as thousands of Skype chat messages of an explicit nature." (Mot. for Summ. J., Doc. 26, #3367). Dix clarifies that there were only "500 unique URL visits to explicit adult web cam sites, not thousands." (SOUF, Doc. 31-1, ¶ 5, #3548).

cure his misconduct. (Compl., Doc. 1, ¶ 23, #4). Based on the breach, Dix claims that he is entitled to the $100,000 retention bonus. (*Id.*). The second breach of contract claim (Claim III), in contrast, stems from Dix's employment contract with Anthelio. Specifically, Dix claims that, when Atos acquired Anthelio, it assumed Anthelio's contractual promise to pay Dix three months of severance in the event that it should fire him "without cause." (*Id.* at ¶ 28, #5). Dix says that his termination here was "without cause," meaning that Atos has a contractual obligation to pay his severance. (*Id.*). Finally, Dix also brings a common law conversion claim (Claim II), alleging that Atos refused to give Dix the opportunity to retrieve certain documents in his laptop's "personal documents" folder. (*Id.* at ¶ 26, #5; Dix Decl. Ex. 2 Doc. 31-2, #3566).

Atos asserts that all of Dix's claims are frivolous. In fact, on December 10, 2019, Atos sent a "safe harbor" letter to Dix indicating that it intended to seek Rule 11 sanctions on account of Dix's "frivolous" claims. (Mot. to Sever, Doc. 33, #3620; Mot. to Sever Resp., Doc. 37, #3636). Dix and Atos went back and forth for several months until, on February 14, 2020, Atos notified Dix that it intended to file both a motion for summary judgment and motion for Rule 11 sanctions on March 6, 2020. (Mot. to Sever Resp., Doc. 37, #3637). On March 3, 2020, Dix and Atos discussed whether Atos would still seek sanctions for Counts II and III if and when Dix agreed to dismiss those claims.[3] Atos indicated that it would not commit to limiting its sanctions motion until Dix actually dismissed the claims. (Mot. to Sever Resp. Ex. 1, Doc. 37-1, #3642).

---

[3] The parties have different perspectives on the March 3, 2020 conversation. Dix says that he contacted Atos to tell them that he had already decided to dismiss Counts II and III and just wanted to know if they would still seek sanctions for those claims. (Mot. to Sever Reply, Doc. 40, #3772). Atos, in contrast, understands that Dix called to bargain, offering to dismiss the

On March 6, 2020, the same day as Atos had intended to file its motions, Dix filed a "Notice of Voluntary Dismissal" seeking to dismiss Count II, his conversion claim, and Count III, his breach of contract claim for severance pay. (Doc. 22). This "Notice," however, was ineffective. As the Court explained in its March 17, 2020 order, "Dix should have filed a Rule 21 *motion* to sever claims instead of purporting to unilaterally dismiss by notice." (Op. on Dix's Notice, Doc. 29, #3518). The Court accordingly denied Dix's "Notice" without prejudice and instructed him to refile using a motion under Rule 21, not a notice under Rule 41. (*Id.* at #3251).

But, before Dix could file the proper Rule 21 motion, Atos filed a motion for summary judgment, (Doc. 26), and a motion for Rule 11 sanctions, (Doc. 27). Although Dix had not yet properly moved to dismiss Claims II and III, Atos preemptively directed both of its motions towards Dix's remaining claim—i.e., that Atos breached the Retention Agreement when it fired him without first offering him the "contractually required" opportunity to cure his misconduct. In its motion for summary judgment, Atos argues that it had no obligation to allow Dix to "cure" his misconduct because "[s]uch conduct was, by its nature, simply incapable of being cured." (Mot. for Summ. J., Doc. 26, #3375). Therefore, Atos argues that it did not breach the contract by failing to offer a cure period. And absent any breach, Atos reasons, Dix's breach of contract claim fails as a matter of law.

Beyond arguing that Dix's breach of contract claim fails on the merits, Atos also asserts that Dix's claim is so factually and legally groundless that the Court

---

claims in exchange for Atos's agreement not to file a motion for sanctions. This difference in viewpoints does not affect the Court's decision.

should assess Rule 11 sanctions both on Dix and his counsel. (Mot. for Sanctions, Doc. 27). Atos's motion for sanctions largely reiterates the same argument as its motion for summary judgment: because "Dix's misfeasance was, by its very nature, incurable," Atos did not breach the contract when it failed to permit Dix to "cure" his misconduct. (*Id.* at #3396). Atos explains that without a breach, Dix's breach of contract claim is factually and legally untenable. The Court should sanction Dix, Atos argues, for continuing to pursue this "groundless" claim. (*Id.*).

A few weeks after Atos filed its two motions, Dix filed a Rule 21 motion to sever Counts II and III of his Complaint, and then to dismiss them with prejudice. (Mot. to Sever, Doc. 33). There, Dix explains that he "believes that the decision to sever and dismiss Counts II and III will result in minimal, if any, prejudice to" Atos because "[i]t appears that little time has been devoted to those claims." (*Id.* at #3620). Atos responded on April 21, 2020, indicating that, although it does not oppose the dismissal of Counts II and III, Atos is seeking the fees and costs it incurred defending against those claims. (Mot. to Sever Resp., Doc. 37).

All three motions have been fully briefed and are now ripe for review.

## LAW AND ANALYSIS

The Court first addresses Dix's Motion to Sever Counts II and III, then Atos's Motion for Summary Judgment, and finally turns to Atos's Motion for Sanctions.

**A. The Court Severs, And Dismisses Claims II And III, But Denies Atos's Request For Attorneys' Fees As A Condition Of Dismissal.**

Federal Rule of Civil Procedure 21 allows the Court, either by motion or on its own, to "at any time, on just terms, add or drop a party … [or] sever any claim against

6

a party." District courts have "broad discretion in determining whether or not actions should be severed." *Parchman v. SLM Corp.*, 896 F.3d 728, 733 (6th Cir. 2018) (quoting *Johnson v. Advanced Bionics, LLC*, No. 2:08-CV-02376-JPM, 2011 WL 1323883, at *6 (W.D. Tenn. Apr. 4, 2011)). In exercising that discretion, however, courts should consider a variety of factors, including "whether settlement of the claims or judicial economy would be facilitated" and "whether prejudice would be avoided if severance were granted." *Id.* (citing *Productive MD, LLC v. Aetna Health, Inc.*, 969 F. Supp. 2d 901, 940 (M.D. Tenn. 2013)).

Although Rule 21 expressly concerns "severing" claims, courts in this Circuit have interpreted the Rule to simultaneously allow for the subsequent dismissal of the severed claims. *See, e.g.*, *Wilkerson v. Brakebill*, No. 3:15-CV-435, 2017 WL 401212, at *2 (E.D. Tenn. Jan. 30, 2017) (collecting cases). Once a court severs two claims, they proceed as "separate suits for the purpose of finality and appealability." *Kitchen v. Heyns*, 802 F.3d 873, 874 (6th Cir. 2015) (quoting *Gaffney v. Riverboat Servs. Of Ind., Inc.*, 451 F.3d 424, 441 n. 17 (7th Cir. 2006)). Accordingly, Rule 21 gives the Court discretion to both sever and dismiss claims "on just terms." Fed. R. Civ. P. 21.

Here, both parties agree that it is appropriate to sever (and then dismiss) Claims II and III. Accordingly, the only task left for the Court is to determine the "just terms" for such severance (and dismissal). "Several federal courts have interpreted 'on just terms' to mean 'without gratuitous harm to the parties.'" *Smith v. Penman*, No. 2:20-cv-12052, 2021 WL 634733, at *3 (E.D. Mich. Feb. 18, 2021) (citing *Harris v. Gerth*, No. 08-CV-12374, 2008 WL 5424134, at *5 (E.D. Mich. Dec.

30, 2008)). Here, then, the Court must determine whether severing and dismissing Claims II and III would cause "gratuitous harm" to either party and, if so, what "just terms" might ameliorate that harm.

Atos argues that, because it had to defend against these now defunct claims, the Court should award attorneys' fees as a "just term" for severance and dismissal. As discussed above, Atos asked Dix to dismiss his claims for almost three months. Dix did not express an interest in doing so until March 3, 2020, and he did not take any formal action until he filed the ineffective "notice" of dismissal on March 6, 2020, which was the day Atos was set to file its motions for sanctions and for summary judgment. Atos filed both motions three days later, on March 9, 2020, but alleges that it "had to revise its brief at the last second" to remove "short arguments" as to both Counts. (Mot. to Sever Resp., Doc. 37, #3637, 3638). Accordingly, Atos claims that it "sustained at least some amount of damage in having to defend these claims, even if the damage is relatively minimal." (*Id.* at #3638–39).

The fact that any "damage is relatively minimal" is important. Dix and Atos both acknowledge that "the focus [i]n this case has primarily been the retention bonus at issue in Count I," not the conversion or breach of contract claims at issue in Counts II and III. (*Id.* at #3638; Mot. to Sever, Doc. 33, #3621). Accordingly, Atos had originally drafted only "short arguments" directed at these claims in its summary judgment motion. (Mot. to Sever Resp., Doc. 37, #3638). This relatively minimal time investment does not entitle Atos to attorneys' fees as a condition of dismissal.

To be sure, the dismissal of Claims II and III will render valueless the time Atos spent in defending against those claims. But that happens in every case when a party severs and dismisses some of its claims under Rule 21, and it is certainly not true that every defendant receives attorneys' fees as a condition of dismissal.

Rather, the appropriateness of conditioning dismissal on payment of some sanction seems to turn, at least in part, on the magnitude of the alleged harm. That is, the purpose of the "just terms" on dismissal is to ameliorate any "gratuitous harm" the dismissal may cause the defendant. *Annabel v. Mich. Dep't of Corr.*, No. 1:18-cv-914, 2018 WL 5839511, at *4 (W.D. Mich. Nov. 8, 2018). "Harm" can take many forms. But, as relevant here, harm includes the time and costs a defendant spent addressing the now-dismissed-claims, as well as the time and costs the defendant may have to spend to defend against the same claims in the future. *See Bell-Coker v. City of Lansing*, No. 1:17-cv-812, 2009 WL 80291, at *3 (W.D. Mich. Jan. 9, 2009) (citing *Luckey v. Butler Cnty.*, No. 1:05-cv-388, 2006 WL 91592, at *3 (S.D. Ohio Jan. 13, 2006)).[4]

---

[4] *Bell-Coker*, and other cases in this opinion, like *Duff v. Ford Motor*, deal with the dismissal of actions under Rule 41(a)(2), as opposed to the dismissal of parties and claims under Rule 21. That said, both rules permit a court to impose conditions on a dismissal to prevent prejudice. Specifically Rule 41(a)(2) permits courts to dismiss actions "on terms that the court considers proper," whereas Rule 21 permits courts to sever and dismiss parties "on just terms." Not only is the statutory text concerning "conditions" similar between these two rules, but conditioning a dismissal under both rules also serves a similar goal. Namely, conditions of a Rule 41 dismissal are meant to "protect the nonmovant from unfair treatment," *Bridgeport Music, Inc. v. Universal-MCA Music Publ'g, Inc.*, 583 F.3d 948, 953 (6th Cir. 2009), but in a Rule 21 context, conditions are designed to prevent "gratuitous harm." *Annabel v. Mich. Dep't of Corr.*, No. 1:18-cv-914, 2018 WL 5839511, at *4 (W.D. Mich. Nov. 8, 2018). In sum, both conditions stand for the proposition that the court should impose only those conditions that prevent unjust harm to the non-movant.

Accordingly, the Court has considered cases that examine conditions of dismissal under Rule 41 in addition to cases evaluating "just terms" for dismissal under Rule 21.

Whether a defendant's investment of time and resources defending claims is substantial enough to warrant the imposition of attorneys' fees is a case-by-case inquiry. On one end of the spectrum lie cases where conditions up to and including attorneys' fees are clearly appropriate, because the defendant dedicated significant resources to defending a claim only to have the plaintiff file a surprise "gotcha" dismissal near the end of litigation. This was the case in *Duffy v. Ford Motor Co.*, for example, where the plaintiffs voluntarily dismissed their personal injury lawsuit against the defendant on the third day of trial. 218 F.3d 623, 624–25 (6th Cir. 2000).

Other times, the fact pattern presents a closer call. To illustrate, in *Crozin v. Crown Appraisal Group, Inc.*, Nos. 2:10-cv-581, 2:10-cv-764, 2012 WL 139219 (S.D. Ohio Jan. 18, 2012), the defendant sought attorneys' fees as a condition of dismissal when twenty-two of the sixty-seven plaintiffs sought to exit the lawsuit even though discovery had closed and the parties had set a trial date. *Id.* at *3. This situation may not be as egregious as *Duffy*, but dismissing twenty-two plaintiffs would still undercut the defendant's work on those plaintiffs' claims. Nonetheless, the court found "no reason to condition [the] dismissal." *Id.* As the court noted, the imposition of attorneys' fees is a "particularly … onerous term," that, it determined, was not appropriate in that case. *Id.*

---

Moreover, the Court's recognition that Rule 41 standards may apply to Rule 21 dismissals is not novel. For example, when a court evaluates potential prejudice, which is relevant to the question of whether to permit severance of claims under Rule 21, courts "nevertheless consider Rule 41 standards as guidance." *See, e.g.*, *Wilkerson v. Brakebill*, No. 3:15-cv-435, 2017 WL 401212, at *2 (E.D. Tenn. Jan. 30, 2017) (quoting *Arnold v. Heyns*, No. 13–14137, 2015 WL 1131767, at *4 (E.D. Mich. Mar. 11, 2015)).

Atos suffered less prejudice defending against Claims II and III in this case than the defendant in *Crozin*. In fact, Atos freely acknowledges that it spent relatively minimal time on these claims. Any minimal harm to Atos is further diminished by the fact that Dix seeks dismissal with prejudice as to both claims. (Mot. to Sever Reply, Doc. 40, #3774). Perhaps attorneys' fees could be appropriate if Dix sought a dismissal without prejudice, because the fees might "compensat[e] [Atos] for expenses in preparing for trial in … light of the fact that a new action may be brought in another forum." *Spar Gas, Inc. v. AP Propane, Inc.*, No. 91-6040, 1992 WL 172129, at *2 (6th Cir. 1992) (quoting *Smoot v. Fox,* 353 F.2d 830, 833 (6th Cir. 1965)) (discussing when and why it is appropriate to award attorneys' fees as a condition of dismissal). But that is not the case here. Rather, the only harm Atos suffered with respect to these two minor claims was the time and cost it already spent drafting and researching two short arguments.

The harm Atos identifies is insufficient to warrant an award of attorneys' fees as a "just term" for dismissal. The Court thus **GRANTS** Dix's motion to sever and dismiss Claims II and III, (Doc. 33), but declines to award attorneys' fees to Atos.

## B.   Atos Is Not Entitled To Summary Judgment On Dix's Remaining Breach Of Contract Claim.

The remaining claim in this action, then, is Claim I, in which Dix argues that Atos breached its contract with him, entitling Dix to the $100,000 retention bonus that he would have otherwise received under the Retention Agreement. Atos seeks summary judgment that it did not breach that agreement. As discussed below, the Court denies that motion.

11

### 1.    The Dispute Centers On Whether Atos Had A Contractual Obligation To Permit Dix To Cure His Misconduct.

Under the terms of the Retention Agreement, Atos must pay Dix the specified bonus so long as Atos did not fire Dix "for cause" before June 30, 2017. (Retention Agreement, Doc. 1-1). As relevant here, the Retention Agreement defined a dismissal "for cause" to include instances where an employee "fail[ed] to adhere to the policies and procedures of the Company and fail[ed] … to correct such failure within five (5) days following notice of such failure from the Company." (*Id.* at #8–9). This definition contains two subparts. Specifically, an employee is terminated for cause (and thus forfeits the retention bonus) if he *both* (1) violates Atos's policies or procedures, *and* (2) does not correct that failure within five days after receiving notice of the policy violation.

There is not much dispute as to the first element. Dix admits that he "used the company-issued computer to visit internet sites that involved pornography." (Dix Decl., Doc. 31-2, ¶ 20, #3557). Moreover, although Dix says that he never accessed explicit material in front of any of his colleagues, he acknowledges that he may have visited such sites "during normal work hours … [while] at home." (*Id.* at ¶ 26, #3557). As Atos points out, doing so violates numerous company policies, including Atos's workplace Computer Policy, Internet Policy, Employee Conduct and Work Rules, and the Counseling and Discipline Policy.[5]

---

[5] Atos's Computer Policy says that its computers are for "business use only" and prohibits the use of Atos's technology in a "non-professional manner." (Doc. 24-3, #97). The Internet Policy provides that "[t]he display or viewing of any kind of material that may be viewed as offensive, involving matters such as … pornography … is in strict violation of Atos policy." (Doc. 24-5, #103). The Employee Conduct and Work Rules explain that an employee may not

Not surprisingly, then, in his response to Atos's Motion for Summary Judgment, Dix does not dispute (or at least, does not discuss) whether he violated Atos's workplace policies. (*See generally* Mot. for Summ. J. Resp., Doc. 31). Rather, Dix focuses exclusively on the second element—i.e., the notice and cure provision. Dix argues that the Retention Agreement "clear[ly] and unambiguous[ly]" required Atos to offer Dix five days to cure his misconduct. (*Id.* at #3530). As Atos failed to do so before terminating him, Dix reasons, his termination was not "for cause" as defined the Retention Agreement. Accordingly, Dix claims that, because his termination was in violation of the agreement, Atos has a contractual obligation to pay him the $100,000 retention bonus he would have earned but for that improper termination.

In response, Atos does not (and could not) dispute either (1) that the Retention Agreement includes a notice-and-cure provision applicable to alleged violations of workplace policies, or (2) that Atos did not provide Dix an opportunity to cure with regard to the violation here. Rather, Atos argues that, notwithstanding the contract's plain language, Atos had no obligation to offer Dix an opportunity to cure here, as "Dix's misfeasance was, by its very nature, incurable." (Mot. for Summ. J., Doc. 26, #3377). And, because Dix's breach was incurable, Atos claims, it had every right to immediately terminate him without affording him an opportunity to cure. As a result, Atos explains, the termination did not violate the contract, and accordingly Dix is not entitled to his retention bonus.

---

use Atos's computer equipment to "to access inappropriate material or Internet sites." (Doc. 24-6, #107). Finally, Atos's Counseling and Discipline Policy provides that Atos may immediately discharge an employee for "misuse of Company assets." (Doc. 24-4, #100).

The question for the Court on summary judgment, therefore, is whether any reasonable jury could find that Atos violated the Retention Agreement by failing to provide Dix an opportunity to cure his misconduct on the facts here. *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

### 2. *Michigan Law Governs This Breach Of Contract Dispute.*

This is a diversity action, so the Court applies state contract law. *See V & M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th Cir. 2012) (explaining that, when cases are in federal court under diversity jurisdiction, state substantive contract law applies). But a threshold issue the Court must address is which State's law applies.

In its motion for summary judgment, Atos failed to specify which State's law it contends should apply here, instead referring almost exclusively to federal cases from varying jurisdictions interchangeably. Dix's response, by contrast, seemed to at least recognize that this is a state-law issue, as Dix repeatedly cites Ohio law for basic contract law principles. (Mot. for Summ. J. Resp., Doc. 31, #3528–29). That said, Dix did not engage in any choice-of-law analysis, and later in his motion, Dix cites a variety of state law, from states such as Kentucky, Ohio, Michigan, Minnesota, Massachusetts, Wisconsin, and New York. (*Id.* at #3530–34, 3438–39). *See also Smith v. General Motors LLC*, 988 F.3d 873, 878 (6th Cir. 2021) (finding it "troubling … that Plaintiffs have failed to specify which jurisdiction's laws, federal or otherwise, govern their suit"). Atos's reply brief marks the first time that either party expressly addresses the choice-of-law issue. There, Atos contends that Michigan law ultimately

applies. That is so, Atos says, because this Court must apply Ohio substantive law, including Ohio's choice-of-law provisions. Those provisions, in turn, adopt a "most significant relationship" test. And here, Atos asserts, the contract has the most significant relationship to the State of Michigan. (Mot. for Summ. J. Reply, Doc. 39, #3713).

The Court agrees that Michigan law governs this contract dispute. As this is a diversity matter, Atos is correct that this Court applies Ohio's substantive law, including its choice-of-law provisions. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Ohio has adopted the approach set forth in the Restatement (Second) of Conflicts §§ 187–88. *Ohayon v. Safeco Ins. Co. of Ill.*, 747 N.E.2d 206, 209 (Ohio 2001). Under that approach, where, as here, a contract lacks a choice-of-law provision, (*see generally* Retention Agreement, Doc. 1-1), the court should apply the law of the State with the most significant relationship to the parties and the contract. *Ohayon*, 747 N.E.2d at 209. And, in ascertaining which State that is, the Court "should consider the place of contracting, the place of negotiation, the place of performance, the location of the subject matter, and the domicile, residence, nationality, place of incorporation, and place of business of the parties." *Id.* (citing Restatement (Second) of Conflicts § 188(2)(a)–(d) (Am. L. Inst. 1971)).

The various factors point to three different States, namely Texas, Ohio, and Michigan. Of these three States, however, it is evident that Michigan bears the *most significant* relationship to the contract and the parties. To start, while Atos has its principal place of business in Irving, Texas, (Brown Suppl. Decl., Doc. 39-1, ¶ 3,

#3727), it maintains offices both in Flint, Michigan and Mason, Ohio (*see e.g.*, *id.*; Dean Decl., Doc. 39-2, ¶ 4, #3739). Dix's position at Atos was Client Executive for McLaren Health Care in Michigan. (Dix Decl., Doc. 31-2, ¶ 6, #3555; Compl., Doc. 1, ¶ 6, #2). At all times during his employment with Atos, Dix both lived and worked full time in Michigan. (*Id.*; Dix Interrog. Answers, Doc. 39-5, #3769). Moreover, although Atos fired Dix during a meeting in Mason, Ohio, (Dix Decl., Doc. 31-2, ¶ 11, #3556), Atos first discovered the inappropriate material on Dix's laptop in Michigan, through employees at its Flint, Michigan office. (Dean Decl., Doc. 39-2, ¶ 4, #3749).

In sum, not only do both parties have close ties to Michigan, but also the subject of the Retention Agreement—Dix's employment—was to occur almost entirely in Michigan, which is also where the violation of workplace policies giving rise to the termination occurred. Accordingly, Michigan has the *most significant* relationship, and its law thus governs this dispute.

### 3. *Whether Atos Fired Dix For An Incurable Breach Is A Question For The Jury.*

Michigan law provides that, "where one party to a contract commits a material breach, the nonbreaching party is entitled to terminate the contract." *Convergent Grp. Corp. v. Cnty. of Kent*, 266 F. Supp. 2d 647, 657–58 (W.D. Mich. 2003) (citing *Lynder v. S.S. Kresge Co.,* 45 N.W.2d 319, 325 (Mich. 1951)). The parties, however, may condition "the right to terminate for a material breach upon notice and the opportunity to cure." *Id.* at 658 (citing *Lichnovsky v. Ziebart Int'l Corp.,* 324 N.W.2d 732, 737 (Mich. 1982)). In other words, a notice and cure provision requires the non-

16

breaching party to first allow the breaching party to cure its misconduct before the non-breaching party has a right to suspend its own performance.

But Michigan law also recognizes that not all breaches are curable. When a breach is "incurable," any notice-and-cure provision is inapplicable. As a result, the non-breaching party has no obligation to provide the breaching party notice and opportunity to cure. *See, e.g.*, *Patel v. Wyandotte Hosp. & Med. Ctr., Inc.*, No. 230189, 2003 WL 1985257 (Mich. Ct. App. Apr. 29, 2003). *Patel* provides a good example. There, the defendant-hospital fired an emergency room physician after he "conducted an inappropriate examination of the patient's breasts and abdominal area when she came to the emergency room." *Id.* at *1. The physician sued, arguing that his employment agreement required the defendant-hospital to provide him 30 days to cure his misconduct. *Id.* at *14. The defendant-hospital countered that "no opportunity to cure needed to be given because of the nature of the breach involved." *Id.* Both the trial court and Michigan Court of Appeals agreed, holding that the notice and cure provision is "not applicable in the present case" because "[c]learly, improper conduct toward a particular patient cannot be 'cured.'" *Id.*

Michigan's recognition that certain breaches are "incurable," and thus render any notice-and-cure provision inapplicable, is the "prevailing approach" across the country. *Peoria Partners, LLC v. Mill Grp., Inc.*, No. 15 C 6680, 2015 WL 8989675, at *7 (N.D. Ill. Dec. 16, 2015); *see also AgTech Sci., LLC v. Blue Circle Dev.*, No. 5:19-cv-00118, 2020 WL 1975375, at *3 (E.D. Ky. Apr. 24, 2020). Simply stated, "a non-breaching party need not comply with a contractual notice and cure provision when

17

the material breach is incurable." *Id.*

But applying that rule in turn requires a framework for assessing what renders a given breach "incurable." While the topic has not received extensive case law discussion, it appears that curability is inextricably intertwined with materiality. *See Anacapa Tech., Inc. v. ADC Telecomm., Inc.*, 241 F. Supp. 2d 1016, 1020 (D. Minn. 2002). That makes sense from first principles. As noted above, if two parties (Party A and Party B) have a contract, Party A's breach, as a general rule, will not relieve Party B of further obligations unless the breach is "material," or what some Michigan cases refer to as a "substantial breach." *Vista Prop. Grp., LLC v. Schulte*, No. 347471, 2020 WL 5581751, at *2 (Mich. Ct. App. Sept. 17, 2020). A notice-and-cure provision puts a further gloss on that. Essentially, if Party B contends that Party A materially breached the agreement, then, before Party B suspends its own performance, it must provide Party A notice and an opportunity to "cure." That is, Party B must allow Party A an opportunity to take ameliorative steps before Party B determines whether it can suspend its own performance. Whether a breach is "curable," then, depends on whether the residual harm that will remain after any efforts by the breaching party to "cure" is enough, in and of itself, to constitute a material breach. If there are no ameliorative steps that the breaching party can take that would prevent the residual harm from exceeding the "materiality" threshold, the breach is "incurable."[6] And in such cases, waiting for the cure period to lapse is merely an exercise in futility.

---

[6] In a way, the fact that "incurable" breaches permit the non-breaching party to suspend performance is a variation of the hornbook-contract-law concept of "constructive condition of exchange." The constructive condition of exchange says that "bilateral promises are not absolute," but rather one party's performance is conditioned on the other party's material

18

Here, the agreement at issue involves employment. Employment contracts (or retention contracts, for that matter) generally facilitate cooperation between an employee and his employer. By extension, then, a breach of such a contract would be incurable if the nature of the breach so severely damages the relationship between the parties as to make it impossible for the parties to continue working together in the way the contract contemplates, no matter what ameliorative steps the breaching party takes. As a Pennsylvania court put it, if one party's breach is "so exceedingly grave as to irreparably damage the trust between the contracting parties," then no modifications in behavior on a going-forward basis could serve to cure the breach. *Apacheta Corp. v. Lincare, Inc.*, No. 16-2030, 2018 WL 3831377, at *11 (E.D. Pa. Aug. 13, 2018) (quoting *LJL Transp., Inc. v. Pilot Air Freight Corp.*, 962 A.2d 639, 652 (Pa. 2009)).

To expand on that notion, say, for example, that an employee engages in substantial fraud against his or her employer. Such a breach could well be "incurable," as there is no way to re-earn the employer's trust, no matter what the employee does in an effort to "fix" things. *See, e.g.*, *Falls v. State Farm Ins. Mut. Auto Ins. Co.*, 774 F. Supp. 2d 705, 712 (M.D. Pa. 2011). The residual harm from the initial breach is simply too great. *Falls* illustrates the point. That case involved a State Farm employee who used another employee's password to log into that employee's account and then, while posing as that employee, finished that other employee's assigned

---

performance. *Rowe v. Montgomery Ward & Co.*, 473 N.W.2d 268, 287 (Mich. 1991) (Boyle, J., concurring). Here, too, the non-breaching party's performance is conditioned on the promise that, after a "cure-period," the breaching party will have performed, and continue to perform, all material obligations under the contract.

19

coursework. *Id.* at 708. Such a breach, the court explained, was incurable because "the breach of trust … is so grave that [it] could not help but have irreparably damaged the trust between the parties." *Id.* at 712. In a similar case, the District of Maryland held that an employee who appropriated proprietary information and booked revenue from orders that had not been finalized caused a "loss of faith and trust in" the employee that the employer "reasonably deemed to be incurable." *Jorgensen v. United Comm'ns Grp. Ltd. P'ship*, No. 8:10-cv-00429, 2011 WL 3821533, at *7 (D. Md. Aug. 25, 2011). In short, if the residual harm from the initial breach will be a material breach, no matter what the breaching party does, then the breach is incurable. And, in the context of an employment agreement, the relationship between the parties is often the material term at issue.

This interconnection between notions of "curability" and "materiality" presents somewhat of a hurdle at summary judgment, as there is no bright-line rule for determining whether a given breach is material. The ultimate question on that front is "whether the nonbreaching party obtained the benefit which he or she reasonably expected to receive." *Vista Prop. Grp.*, 2020 WL 5581751, at *2 (quoting *Holtzlander v. Brownell*, 453 N.W.2d 295, 298 (Mich. Ct. App. 1990)). But courts are instructed to make that determination based on a host of "relevant considerations," including, for example, the extent to which the non-breaching party received its benefit under the agreement, the availability of monetary damages, the comparative hardships between the parties, and the culpability of the breaching party's behavior. *Id.* at *2–3 (citing *Walker & Co. v. Harrison*, 81 N.W.2d 352, 355 (Mich. 1957)). Not

surprisingly, given the description of such "relevant considerations," "where reasonable minds could differ about the conclusions to be drawn from the evidence, the question whether a party committed a material or substantial breach is one of fact." *Demaria Bldg. Co. v. Word of Faith Int'l Christian Ctr.*, No. 252892, 2005 WL 1651706, at *2 (Mich. Ct. App. July 14, 2005) (citing cases). Or, as one noted contracts hornbook puts it, "[t]he issue of whether a particular breach is material or not is … generally a question of fact." 23 Williston on Contracts § 63:15 (4th ed.).

Against that legal backdrop, the Court can grant summary judgment only if it concludes that, on the undisputed facts here, no reasonable jury could find that Dix's breach—i.e., the breach caused by his violation of workplace rules—was curable. On that front, Atos relies on what might be called an unringable-bell theory, i.e., Atos argues that no matter what Dix does on a going-forward basis, that will not change the fact that the original violation itself occurred. Therefore, Atos asserts, the violation is not curable.

But it is hard to square that argument with the contract's plain language. The notice-and-cure provision here only applies to violations of workplace rules. But in every such case, there is no way to "undo" the original violation that gave rise to the breach. Rather, all an employee can do is change his or her behavior going forward. Thus broad application of Atos's unringable-bell rule would make all such breaches incurable. But that in turn would render the contractual notice and cure language a nullity, an interpretive result that Michigan law instructs courts to avoid. *Klapp v. United Ins. Grp. Agency, Inc.*, 663 N.W.2d 447, 453 (Mich. 2003) ("[C]ourts must also

give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory.").

Given the contract's language, the Court concludes that the key question on incurability is whether the workplace policy violation that constituted the breach gave rise to such egregious harm that a going-forward change in behavior cannot overcome that harm. That determination necessarily involves both an objective and a subjective component. *See Jorgensen*, 2011 WL 3821533, at *7 (noting that the employer must "reasonably deem" the breach to be incurable). That is, to prevail at summary judgment, an employer must first show that there is no genuine dispute that a reasonable employer could, objectively, have believed the breach was incurable. In other words, the employer must show that it reasonably could have believed that the harm created by the already-completed violations of workplace rules was so substantial that a promise not to engage in such behavior in the future would still leave the employee in a position of material breach. Second, the employer must also show that there is no genuine dispute that the *actual* (i.e., subjective) reason for terminating the employee was the workplace policy violation. *See, e.g.*, *id.* ("Although courts should not second-guess an employer's personnel decisions, a court may determine whether an employer terminated an employee for the reasons the employer cites as for cause.") (internal citations omitted).

Although these analyses are admittedly fact-dependent, that does not necessarily preclude summary judgment. Sometimes, the proffered reason for termination may be so clearly curable as an objective matter that a court can reject,

as a matter of law, an employer's argument that it did not need to offer the employee an opportunity to cure. In *Convergent*, for example, the Western District of Michigan dismissed an employer's argument that its contractor's failure to provide a product that "conform[ed] to the requirements specified in the agreements" was an incurable breach. 266 F. Supp. 2d at 655. According to the court, the contractor could have completely remedied the defects in the product. Therefore, the court held that, under Michigan law, the contract's notice and cure term required the employer to provide the contractor an opportunity to cure its error. *Id.* at 658.

Other times, the harm resulting from an employee's past misconduct is so egregious that, as a practical matter, it is clear that no going-forward cure could remedy it, or, alternatively, that no jury could reasonably find that the employer's reliance on the conduct as grounds for termination was somehow pretextual. So, for example, when a hospital fires a doctor for inappropriately touching his patient, *Patel*, 2003 WL 1985257, or when a franchisor terminates a franchisee who engaged in fraudulent and illegal business practices, *Giuffre Hyundai Ltd. v. Hyundai Motor Am.*, 756 F.3d 204 (2d Cir. 2014), a court may well conclude at summary judgment that there is no genuine dispute that the employer in fact believed that the employee's breach is incurable. At bottom, when the residual harm from the initial breach is either de minimis or clearly egregious, the Court can dispose of the case on summary judgment because a reasonable jury could come to only one conclusion about the curability of the breach.

The facts surrounding Dix's termination lie somewhere between those poles. Start with the objective component. At the time that Atos terminated Dix, it knew that he had viewed pornographic material and sent explicit messages on his work computer during work hours.[7] (SOUF, Doc. 31-1, ¶¶ 3–4, #3546–47). Moreover, Atos also asserts that, at the time of termination, it believed that Dix himself was depicted in the explicit content.[8] (*Id.* at ¶ 5, #3547–48). Finally, Atos knew that one of Dix's colleagues had been exposed to the explicit material (as a result of working on Dix's computer). Based on this knowledge, the Court agrees that Atos could have reasonably concluded that Dix's disregard for Atos's policies and workplace norms in the specified manner meant that Atos could no longer trust Dix in his role, in turn implying that there was nothing that Dix could do on a going-forward basis that would resurrect the relationship. *See Falls*, 774 F. Supp. 2d at 712 (deeming a breach incurable because "[i]t was reasonable for State Farm to assume that they could not trust Falls in the future"). Thus, the Court agrees that Atos *could have* found the breach to be incurable.

But that still leaves the subjective inquiry. To obtain summary judgment, Atos must show the absence of any genuine dispute as to whether it *in fact* believed the breach to be incurable. That requires a comparison of the harm caused by the breach,

---

[7] As discussed above, Atos later hired a contractor to conduct a forensic investigation of Dix's computer which revealed the full extent of Dix's inappropriate activity on the computer. The Court agrees with Dix, however, that the results of that investigation are irrelevant to this issue because Atos was not aware of that information at the time it terminated Dix's employment.

[8] Dix insists that he was not depicted in any of this material, and Atos does not make an effort to dispute Dix's argument on that front. (SOUF, Doc. 31-1, ¶ 5, #3547–48; Dix. Decl., 31-2, ¶ 24, #3557).

on the one hand, and potential alternate explanations for the employer's decision to terminate, on the other. Regarding the harm, as already noted, the conduct here was certainly inappropriate, but seems to fall short of the types of conduct that *require* a finding of incurability. Thus, the Court must consider whether there are alternate explanations that could support a jury finding that Atos's stated reason was not its *actual* reason.

The most obvious potential alternative explanation here is the undisputed fact that, if Atos terminated Dix "for cause," it would not have to pay him the $100,000 retention bonus otherwise due to him.[9] The existence of this potential competing explanation for Atos's termination decision raises at least some question as to whether Atos's claim that there was nothing Dix could do on a going-forward basis to cure his breach was instead pretext for Atos's desire to terminate Dix for some other reason or reasons. Perhaps if Atos had presented evidence showing that it *always*

---

[9] Dix also offers several other alternative explanations in his Complaint. For example, Dix alleges that, at the time of termination, he had disagreements with his supervisor as to "the level of services" that Atos should provide to McLaren Health Care. (Compl., Doc. 1, ¶ 18, #4). Specifically, Dix says that his supervisor expressed resistance when Dix "advocated for services that were in McLaren's best interests and which would have resulted in additional expenses for [Atos]." (*Id.*). To be sure, a dispute between an employer and his supervisor may provide a basis for termination—but that would not be a for-cause termination under the Retention Agreement.

Dix also points to financial considerations as a potential explanation for Atos's actions. Dix was a highly paid executive at Atos. He made over $400,000 yearly, with nearly a $300,000 base salary. (Dix Interrog. Answers, Doc. 39-5, #3769). In his Complaint, Dix alleges that when Atos posted his position, "the compensation for the advertised position was substantially less than the amount [Atos] paid [Dix]." (Compl. Doc. 1, ¶ 21, #4).

Although these alternative explanations might have helped demonstrate pretext, the Court cannot rely on them here, because each explanation exists only in Dix's Complaint, not in any "affidavits, depositions, or other factual material showing 'evidence on which the jury could reasonably find for the plaintiff.'" *Martin v. Huron Valley Ambulance, Inc.*, 226 F. Supp. 3d 871, 881 (E.D. Mich. 2016) (quoting *Anderson*, 477 U.S. at 252).

treated workplace violations of this nature as incurable, or something of that sort, the story may be different. But as things stand now, the Court finds a jury could reasonably conclude that, in denying Dix an opportunity to cure, Atos breached the agreement. In other words, a jury might conclude that Atos did not truly believe that Dix's breach was incurable, but rather latched on to his admitted breach as an excuse to remove Dix without paying him the retention bonus.

None of this is meant to suggest that the Court does—or does not—find Dix's proposed alternative explanation convincing. But that ambiguity just highlights the point. This matter is before the Court on summary judgment, and the Court must take care not to assume for itself the role of finder of fact. In short, a jury, not this Court, is the proper body to determine which of the competing stories regarding Dix's termination is true. The Court thus **DENIES** Atos's Motion for Summary Judgment. (Doc. 26).

## C.    Atos Is Not Entitled To Sanctions.

That leaves one more motion for the Court's consideration: Atos's motion for sanctions. (Mot. for Sanctions, Doc. 27). In that Motion, Atos asserts that this Court should assess Rule 11 sanctions against Dix and his counsel because Dix's breach of contract claim is "legally and factually groundless." (*Id.* at #3387). Federal Rule of Civil Procedure 11 permits a court to sanction a party and his counsel if they present "claims, defenses, and other legal contentions [that] are [not] warranted by existing law" or, alternatively, that are not supported "by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law."

"The conduct of counsel who are the subject of a sanction request is measured by an objective standard of reasonableness under the circumstances." *Merritt v. Int'l Ass'n of Machinists & Aerospace Workers*, 613 F.3d 609, 626 (6th Cir. 2010) (citing *INVST Fin. Grp., Inc. v. Chem–Nuclear Sys., Inc.,* 815 F.2d 391, 401 (6th Cir. 1987)). In other words, a Court should assess Rule 11 sanctions only when counsel presents claims that he should know are so objectively meritless that there is no "honestly debatable issue" for the Court to decide. *Jackson-Colley v. Dep't of Army Corps of Eng'rs*, 655 F. Supp. 122, 134 (E.D. Mich. 1987).

Here, the question of whether Dix's workplace policy violation was "curable" is an honestly debatable question that presents issues of material fact for a jury. Therefore, Dix's claim is supported by "non-frivolous argument," and is simply not the kind of egregious or groundless claim that can give rise to Rule 11 Sanctions. The Court accordingly **DENIES** Atos's Motion for Sanctions. (Doc. 27).

## CONCLUSION

For the reasons discussed above, the Court **GRANTS** Dix's Motion to Sever Counts II and III, (Doc. 33), and dismisses those claims **WITH PREJUDICE**. The Court also **DENIES** Atos's Motion for Sanctions. (Doc. 27). Finally, the Court **DENIES** Atos's Motion for Summary Judgment on Dix's remaining claim, Claim I, for breach of contract. (Doc. 26).

**SO ORDERED.**

March 25, 2021
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**